Shotwell *v.* Mali.

---

[NEW YORK GENERAL TERM, November 24, 1862. *Ingraham, Leonard* and *Barnard,* Justices.]

———•••———

## SHOTWELL *vs.* MALI and others.

It is well settled that an exception to the refusal of the court to dismiss the complaint cannot be sustained on account of the deficiency of any proof that might have been supplied upon the trial, had the attention of the court and of the opposite party been called thereto.

The officers of a corporation, authorized to issue certificates to the stockholders, as evidence of title to stock, are liable not only to the immediate purchasers from them of spurious stock, falsely and fraudulently certified by them, but to any subsequent purchaser buying upon the faith of the false certificate, and sustaining damage thereby.

Although the purchaser of spurious stock has a remedy against his vendor, for a breach of the implied warranty of title, that right of action does not constitute a bar to an action against one who has induced the purchase, by a fraudulent representation that the vendor had title to the stock, where damage has resulted from the fraud.

The purchaser's right of action against the officers of a corporation concerned in issuing certificates of spurious stock is complete upon the purchase. And that right will not be affected by any subsequent action of the directors of the corporation, in turning out other property to him, to an amount exceeding the sum paid by him for the false certificates.

Any one furnishing another with a false and fraudulent document purporting to show title in the latter to any property, is liable to any person sustaining damage in consequence of reposing confidence therein. *Per* GROVER, J.

The case of *Cazeaux* v. *Mali,* (25 *Barb.* 578,) approved.

THE complaint in this action stated that the plaintiff was the owner of four hundred and eighty shares of the capital

stock of the Parker Vein Coal Company. That the said Parker Vein Coal Company was a corporation created under the laws of the state of Maryland, by an act of the general assembly of said state, passed February 2d, 1850, and exists under said act, and several acts amendatory thereto. That said corporation was created for the purpose of working mines of coal and iron, and for vending the products of the same. That by its act of incorporation, it was provided that the concerns of said corporation should be managed by a president, who should be a director, and four other directors, to be chosen annually by the stockholders, and to serve for the term of one year, and until others should be chosen, and that a majority of said directors should constitute a quorum for the transaction of business. That by the said act of incorporation, the said corporation was empowered to hold and possess real and personal property to the amount of five hundred thousand dollars; and further, it was by said act provided, that the capital stock of said corporation, whether the same should be real or personal, or both, should amount to the sum of five hundred thousand dollars, which should be divided into shares of one hundred dollars each. That by a subsequent act of said general assembly of Maryland, passed on or about the eleventh day of February, 1853, amendatory to said act of incorporation, the said Parker Vein Coal Company was allowed and authorized to increase the capital stock of said company to an amount not exceeding three millions of dollars, to be divided into shares of one hundred dollars each, and was further empowered, by said last mentioned act, to hold not exceeding seven thousand acres of land. And further, that the president and directors of said company were authorized to receive subscriptions to the said additional capital stock, at such times and places as they, or a majority of them, might designate. That said Parker Vein Coal Company was duly organized in pursuance of said act of incorporation with a capital of five hundred thousand dollars, divided into shares of one hundred dollars each,

Shotwell *v.* Mali.

and that subsequently, and in pursuance of said amendatory act of February, 1853, the capital stock of said company was increased to the amount of $3,000,000 divided into shares of $100 each. That said company became and were possessed of a large and valuable property, consisting of lands and mines of coal and iron, and extensive apparatus and implements for carrying on mining operations, and of a large number of steamships, and of other property, which said property, real and personal, was, in the aggregate, of the value of $3,000,000, or over. That said company, before and at the time of the committing of the wrongful and fraudulent acts of the defendants thereinafter mentioned, was in a flourishing and prosperous condition, and the stock of said company was intrinsically of par value, and the market price of the same was par, or nearly so, and but for said wrongful and fraudulent acts of the defendants thereinafter mentioned, the stock would have continued to be of the full par value, and the market price or value thereof would have been and continued to be of the full par value. That on or about the 15th day of June, 1853, Hippolyte Mali, Otis P. Jewett, and James G. Stacey, the defendants in this action, were (with others) duly elected and became directors of said Parker Vein Coal Company, and acted as such. That said Hippolyte Mali was duly made and became president of said company, and said Otis P. Jewett vice president thereof, and said James G. Stacey treasurer thereof, and they thereupon respectively, and about the date last aforesaid, entered upon the duties of said respective offices, and acted as such officers, and that as such directors and officers, the defendants, Mali, Jewett and Stacey, were intrusted with, and had the principal control and management of the property and affairs of said company. That the principal office of the said company was in the city of New York, (where the said defendants resided,) at which office the affairs of the said company were principally managed, directed, and controlled. That the plaintiff became the owner of said four hundred and eighty shares of the capital stock of

said company, by purchase at several dates and times between the 1st day of August, 1853, and the 2d day of June, 1854, inclusive, and still owns and holds the same. That when the plaintiff purchased said stock, the corporation owned and were possessed of property of the value of at least $3,000,000, and sufficient to make the capital stock of said company of full par value. That said Mali, Jewett and Stacey, while they were such directors and officers of the said corporation, and previous to the said 1st day of June, 1854, and while acting as such officers and managers of the company, not regarding their duty in their said offices, but misconducting themselves therein, did fraudulently, willfully and corruptly issue what purported to be shares of the capital stock of the Parker Vein Coal Company, to the amount of one hundred and twenty-eight thousand shares, or thereabouts, over and above and in addition to what said company were authorized by law to issue, and sold and disposed of the said shares of stock, or which purported to be such stock so over issued by them, and realized from the sales thereof large sums of money, amounting in the whole to about $1,300,000, which said sum of money the defendants fraudulently misapplied and appropriated to their own use. That the certificates of the shares of such stock so over issued by the defendants were, in form and appearance, similar in all respects to the certificates of shares of the legitimate stock of said company, and that by reason of said wrongful and fraudulent over issue and sale by the defendants, of such large amounts of what purported to be stock of said company, the genuine and legitimate stock of said company was depreciated in price and value, and was thereby rendered and became valueless and unsalable in the market. That by reason and in consequence of said wrongful and fraudulent acts and misconduct of the defendants in the premises, and the said fraudulent over issue, sale and disposition by the defendants as aforesaid, of what purported to be stock of said company, the said shares of stock of the company so purchased and held by the

plaintiff as aforesaid had been rendered wholly unsalable and valueless, and lost to the plaintiff, whereby he had sustained loss and damage by reason of the premises to the amount of $30,000.

*Second.* And the plaintiff, for a further cause of action against the defendants, alleged that at several dates between the first day of August, 1853, and the second day of June, 1854, inclusive, the plaintiff became the owner, by purchase, of certain other four hundred and eighty shares of the capital stock of the said Parker Vein Coal Company, and that at the time and times of the purchase of said shares of stock, the defendants made false and fraudulent representations respecting the character and value of the said stock and the then position of the company, representing and alleging that the affairs of the said company were in a good and prosperous condition, and wholly withholding and concealing .from the plaintiff the fact that they, the defendants, had theretofore issued and had been, and were then from time to time, issuing large amounts of what purported to be the capital stock of said company, beyond the amount of stock which said company were by law authorized to issue, and made such false and fraudulent representations for the purpose of influencing and inducing various parties, and particularly the plaintiff, to purchase largely of the said stock, and that the plaintiff was influenced thereby in the making of such purchase of stock as aforesaid. That, at the times of making such purchases, the plaintiff had no knowledge or information of any over issue of such stock. That by reason and in consequence of such fraudulent over issue of what purported to be the stock of said company, the shares of the stock of the company have been rendered and become wholly valueless and lost to the plaintiff, and that he had sustained damages thereby and by reason of such false and fraudulent representations made by the defendants, to the amount of $30,000.

*Third.* And the plaintiff, for a further cause of action against the defendants alleged that the said Parker Vein

Coal Company being an incorporation as aforesaid, and the defendants being officers thereof as aforesaid, the defendants, at several dates and times previous to, and from and between the said 1st day of August, 1853, and the 2d day of June, 1854, and subsequently thereto, and after the whole amount of the capital stock of said company had been issued, did make and issue certain false and fraudulent certificates purporting to be certificates of shares of the capital stock of said Parker Vein Coal Company, which said false and fraudulent certificates and shares the defendants, at the dates and times aforesaid, sold and disposed of, and realized therefrom large sums of money. That such certificates were, in form and appearance, identical with the certificates which had been issued for the true and legitimate stock of said company. That the plaintiff, believing such false and fraudulent certificates to be certificates of the true and legitimate stock of said company, purchased what purported to be four hundred and eighty shares of the stock of the company, and the same were duly transferred to the plaintiff, and for which the plaintiff paid large sums of money. That said four hundred and eighty shares so purchased by him as last aforesaid, were soon afterwards ascertained and found to be spurious, and to have been illegally and fraudulently issued, whereby the plaintiff sustained damages amounting to the sum of $30,000. Wherefore the plaintiff demanded judgment against the defendants for the sum of $30,000, besides costs.

The defendants Mali and Jewett answered separately. Mali, in his answer, put in issue most of the allegations of the complaint. He denied that he, with the other defendants, or at all, issued stock of the said company beyond the amount of the capital stock, except that while he was the president of the company, and for a long time prior thereto, it was and had been the usage and practice of that company, and of other stock companies having transfer offices in the city of New York, in the customary course, and for the convenience of their business, to keep certificates of the stock of

such company and companies signed by the proper officers in blank, to be filled up from time to time, as old certificates might be surrendered and new certificates issued, in the course of alienation and transfer by stockholders of their shares of stock, and that the like usage and practice existed in the office and in respect of the stock certificates of the said Parker Vein Coal Company during all the time this defendant was such president; and that, in pursuance of such usage, he signed numerous certificates of such stock, in blank, in the ordinary course of the business of the company, and left the same in the office of said company with the other papers and books of the company, in charge of its officers, to be used for the lawful purpose of transfer, and in the due and ordinary course of transfer of stock and not otherwise; that it was no part of his duty as such president to attend personally to the making of transfers of stock and to the issuing of certificates thereof; that he did not, in fact, make any such transfers, or issue any of such certificates, and that if any of the certificates signed by him were issued otherwise than by the said company, and in and for its lawful business, it was without his knowledge, and contrary to the intention with which he so signed and left them; and he denied all fraud and wrong in respect thereof, alleged against him in the complaint. And he denied that he, in conjunction with the other defendants, or otherwise, issued, received, or sold any of said certificates, or any stock of said company, or received or applied to his or their own use the whole or any part of the proceeds of such issue or sale, or that he in any way participated in such issue, sale, or proceeds, except as above specified; and he denied all the allegations in respect thereof, in the complaint.

The defendant Jewett, by his answer, also denied most of the allegations of the complaint. He denied that he issued the stock of said company beyond the capital thereof, or the amount thereof allowed by law, or sold the same, or applied the proceeds thereof otherwise than as hereinafter stated. That before any of said stock was ever issued, the said com-

pany was indebted to him for money loaned to it by him, and used in paying for real estate and for improvements thereon, and in building and in purchasing steam ships, and otherwise in and about its business, to the amount of about $225,000. That obligations of the company to a large amount, held by various parties, were about maturing, which the company had not the present cash or convertible means to meet, and that in order to pay such obligations at maturity, and to save its credit, and in order to prevent great and ruinous sacrifices of its property and interests, it became necessary to raise and provide large sums of money. That in order to meet such necessity, the defendant Stacey, the treasurer of the company, by order of said company, transferred or issued to this defendant, at different dates and in different amounts, the stock issued by said company beyond the amount of its capital stock. That this defendant pledged portions of such issue to secure temporary loans made to him, and used by him for the said purposes. That when such loans matured it became necessary to pay the same, and to raise further sums owing by said company, and maturing as aforesaid, and defendant would then pledge other and larger portions of such over issued stock, and used the moneys received therefor or thereon in like manner. That all the over issued stock was so used, and all the moneys received thereon were so applied for the use and benefit of the said company, and not otherwise. That all the stock so over issued was about 127,000 shares, and the entire net proceeds received therefor was about $418,000. That the moneys so received from and on account of such over issued stock, and other moneys belonging to the defendant, and lent by him to the company, and used by it about the business of the said company at or about the time such over issues were being made, amounted (over and above the first mentioned sum lent by this defendant to said company) to about the sum of $585,000. That after charging this defendant with the net proceeds of said over issued stock, and all other moneys re-

ceived by him from or on account of the said company, the company was indebted to him, about the 1st day of July, 1854, in about the sum of $250,000, and that the company is now indebted to him in that sum, with the interest which has since accrued thereon.

The defendant Stacey did not answer. The action was tried at the New York circuit, in October, 1860, before the Hon. W. F. ALLEN and a jury. At the close of the plaintiff's testimony the defendants' counsel moved to dismiss the complaint. The court decided that the case should go to the jury on the question whether the stock was spurious. There was evidence of these certificates bearing date, and being issued by the company after the stock was full, and over issues had commenced. In the absence of evidence that these were given on the surrender of stock, it was for the jury to say whether they were genuine or not. The defendants excepted.

The counsel for the defendants offered to examine the plaintiff as to his connection with the American Coal Company, to prove that the plaintiff voted on all his stock for the appointment and election of a new set of directors, in the summer of 1854; that those directors, with his consent, executed an assignment of all the property of the company to trustees, to hold for the use of the Parker Vein Coal Company; that the directors then, with the consent of the plaintiff, as a stockholder of the Parker Vein Coal Company, organized a new company in Maryland called the American Coal Company, and instructed the trustees to sell all the property of the Parker Vein Coal Company, and that the proceeds of that sale, the whole property, was conveyed to the American Coal Company; that that property constituted the capital stock of the American Coal Company; that the stock of the American Coal Company was issued in certain proportions to the stockholders of the Parker Vein Coal Company, who cooperated in these proceedings; that these stockholders received the stock in the new company, in exchange for the stock in the old company; that the plaintiff was among the

stockholders of the Parker Vein Coal Company who took stock in the American Coal Company, under this arrangement, by which his interest in the stock of the Parker Vein Coal Company was transferred to a corresponding interest in the American company, and that the last stock exceeded in value what he gave for the stock in question; and that he did this with full knowledge of the over issue. This testimony was objected to and excluded, and the defendants excepted.

Judge Allen, in charging the jury, said this was a case of some importance, not only by reason of its own character, the position of the defendants, and the amount involved, but also as being one of several causes involving substantially the same question; and if this case were properly disposed of by the jury and the court, it would probably facilitate the other cases still pending. He did not flatter himself that this trial would terminate this particular litigation. Several rulings had been made by the court, to which exceptions had been taken, and in respect to which doubts were resting in his own mind by reason of seemingly conflicting decisions of the general term. To the rulings of the court, however, the counsel submitted, taking exceptions, which gave them the opportunity of review. With this the jury had nothing to do. The question to be submitted to them was purely one of fact: to that they were to respond, and for the right disposition of it, they were responsible. The cause of action, as originally commenced, was three fold in character. First, assuming the stock to be genuine, the plaintiff charged the defendant with over issuing stock by reason of which the plaintiff's stock became diminished in value. The court had ruled that this was a course of action on which he could not recover, to which the plaintiff took exception. The second count was for fraudulent representations in respect to the financial condition of the company, by reason of which the plaintiff was induced to purchase the stock; the defendant representing the company to be prosperous, and the stock to

be valuable, when in truth it was not so.  If the plaintiff
had really purchased this stock upon such representations,
made by the defendant, and the representations were untrue
in point of fact, doubtless it would give him a cause of
action; but the court thought, and the cause had been tried
upon that theory, that in the first place the complaint was
not so framed as to authorize the recovery on that ground;
he also thought the evidence was not sufficient, and it was
safer to charge the jury that the plaintiff could not recover
upon the second cause of action, and that the plaintiff could
only recover on the last cause of action, to wit, that this
stock was spurious.  In order to entitle the plaintiff to re-
cover, he must prove to the satisfaction of the jury: 1st. That
the certificate of scrip bought by him, did not represent
genuine stock, or any part of the capital stock of the com-
pany, but formed part of the over issue, not authorized by
the charter of the company.  2d. That the defendant issued,
or caused to be issued, spurious and unauthorized scrip.
3d.  That plaintiff bought the same, or parted with his money
on the faith that the certificates were issued *bona fide*, and
represented so much of the capital stock of the company.
In the first place, it was proved by the book-keeper that
there was a large amount of over issue.  That was proved
by evidence to which the defendant took exception.  But the
evidence was submitted to them.  The witness said that
before August 6, 1853, (which was the date of the first pur-
chase by the plaintiff,) the over issue had commenced.  To
what extent it had gone was not material.  It was enough to
prove that up to that time, the full capital stock had been
issued, and over issues had then commenced by the parties.
It was also proved by the confessions of the defendant, that
over issues had commenced at that time, and that over issues
to a large amount (about $3,000,000) were made by the
defendant.  There was no dispute about the agency of the
defendant in those over issues—that is, if there was an over
issue, the defendants were the agents by whom they were

effected. The stock was made out either to Mr. Jewett, or to those to whom he transferred it; so the book-keeper testified. In other words, that no over issue was made, except Mr. Jewett had part in it. Mr. Mali was president; and signed all the scrip; so that the agency of the defendants was established. In respect to the fact that the plaintiff bought these certificates of stock, supposing them to be good, there was no reasonable doubt. It was not suggested that he bought them, supposing them to be spurious.

Now, as to whether the certificates in question were part of the over issue, that was the only question for the jury to determine. The court charged that the certificates bearing date, and having been issued after the stock of the company was full, and after the over issues commenced (if such was the fact) was evidence to be submitted to the jury, and which, if uncontradicted and unexplained, authorized them to find that this particular stock was spurious. That is, that the certificates bearing date and having been issued after the stock was full, that fact alone, without other evidence in the case to contradict or explain it, or to show that the stock was based upon scrip before issued, and returned, would be sufficient for the jury to find a verdict for the plaintiff on the question of fact. Not that they were bound to do so, for that was a matter for the exercise of their judgment and discretion. And the jury were to bear in mind that whether this was genuine or spurious stock was known to the defendants, if they had a knowledge of the affairs of the company, which they were presumed to have.

It was claimed by the defendants that this was no evidence to go to the jury, and to the decision of the court that it was evidence they excepted. Then the defendants contended that this evidence was overcome by the testimony of the book-keeper of the company, who stated that these certificates were issued either upon the surrender of other certificates or upon the transfer of stock. The book-keeper made a distinction between the surrender of former certificates and

the transfer of stock. What the witness meant by that the court did not exactly know. He testified that those certificates of spurious stock were made out directly to Mr. Jewett, or to persons to whom he transferred. He said that the certificates were not issued for stock originally purchased that day by Mr. Shotwell; and also, in another part of his testimony, that it was impossible for him to say on what consideration this scrip did issue, or to distinguish this scrip, or to tell whether it was part of the genuine or spurious stock. It would be for the jury to say whether this overcame the other evidence, and to say whether the transfer of stock testified to by Clarke was a part of the over issue or not. If it was an issue of scrip on the transfer of good stock, that ended the action.

Then, in relation to the plaintiff voting upon the stock, if the plaintiff voted in person or by proxy upon his stock, it was a circumstance tending to prove that the stock was genuine; but whether it did prove it was for the jury to say, under all the circumstances and evidence of the case. If the company, by its agents at the polls, suffered any man to vote on this stock, it would be some evidence to show that they treated it as genuine; but if it was so treated without knowledge that it was spurious stock, when in fact it was, it would amount to nothing. The evidence was that the plaintiff went to Mr. Carpenter's office, and gave a proxy to some one to vote for him. Who that was, and whether it was used, did not appear. That would be no evidence, except that the plaintiff supposed he had, at the time, genuine stock.

These were all the principles of law involved; and after all, it resolved itself into the fact whether, on this evidence, the stock in question was genuine or spurious. If spurious, the plaintiff was entitled to recover the amount claimed by him.

The counsel for the defendants asked the court to charge several propositions, which he would now dispose of: 1. That there is not sufficient evidence to warrant a finding that the stock in question is not genuine. That I refuse to charge.

(The defendants excepted.)   2. That even if spurious, there is no evidence that the certificates in question were purchased from the defendants, or from the Parker Vein Coal Company. There is no evidence that the certificates were purchased from either; but I charge, in respect to that, that it is not necessary for the plaintiff to prove that this stock was bought of the defendants or of the company. If the defendants issued this stock, and the plaintiffs purchased it on the faith that it was genuine, authenticated as it was, the defendants are liable, although the actual purchase was made of others. (The defendants excepted.)   3. That if not purchased from the defendants or the company, they are not liable, even if the certificates are spurious. I refuse to so charge. (The defendants excepted.)   4. That if the plaintiff, as holder of certificates, has not been denied by the company any common right of stockholders, he has not been damaged, and is not entitled to recover any more than nominal damages. I refuse to so charge. (The defendants excepted.)   5. That if the plaintiff has directly or by proxy voted on the stock since he became aware of the over issues, he has thereby affirmed the transaction. That I refuse to charge. I charge in respect to that as I have done elsewhere. (The defendants excepted to the refusal, and to the charge as made.)   6. That if he wished to repudiate, he was bound, within a reasonable time, to offer back what he had purchased. That I refuse to charge. (The defendants excepted.)   7. That the plaintiff is not entitled to recover upon an assumption that the stock was depreciated by mixing and confusing spurious with genuine. That I so charge.   8. That there is no sufficient evidence that the genuine and spurious stock cannot be distinguished. So charged.   9. That the burden is upon the plaintiff to produce evidence sufficient to satisfy the jury beyond a reasonable doubt that the stock in question is spurious. I have no fault to find with that, except the words, " beyond a reasonable doubt." I refuse to charge in those words, but I charge that the burden of proof

Shotwell *v.* Mali.

is on the plaintiff, and he must satisfy the jury, by evidence, of the truth of his allegations. 10. That if the jury believe that the certificates in question were issued upon a surrender or transfer of stock certificates previously issued, then they are not at liberty to find that the stock in question had its origin in an over issue. That I so charge. 11. That the plaintiff is not entitled to recover on the second cause of action, or on the ground of any false representations or concealment in the statement alleged ; and the plaintiff cannot recover, unless the jury is satisfied that the certificates produced, or some of them, or some part of the stock therein mentioned, had its origin in an over issue of stock. That I have already charged. The defendants' counsel took exception to each refusal of the court to charge as requested. They also excepted to the court charging that it was for the jury to find whether the transfer of stock testified to by Clarke, was a part of the over issue. Mr. Bidwell for the plaintiff, asked the court to charge in reverse of what it had charged, and took exception to the charge that the plaintiff could not recover upon the first or second count. He also excepted to the charge that the plaintiff was not entitled to recover on the assumption that the stock depreciated by mixing and confusing spurious with genuine, and that there was no sufficient evidence that the genuine and spurious stock could not be distinguished.

The court directed that the questions of law and exceptions be heard in the first instance at general term, and that entry of judgment on the verdict be in the meantime stayed.

The jury brought in a verdict for the plaintiff, for $4571.64.

*M. S. Bidwell,* for the plaintiff. I. The question whether the plaintiff was induced to purchase the stock in consequence of the representations made by Mali was properly admitted. It was proper for the plaintiff to prove the fact of his having been thus induced to make this purchase, and no one but the

---

---

plaintiff himself could give direct and positive testimony of that fact. It was, therefore, proper to ask him the question. No objection appears to have been made to the form of the question as a leading question; and if there had been, it was a matter entirely for the discretion of the judge, which could not be reviewed on a bill of exceptions.

II. The question what the defendant Mali said to the witnesses Mr. Mead and Mr. Bramhall in relation to the over issues, was admissible. Such over issue was a proper subject of inquiry under the pleadings in this case. It was a matter in issue in the case. The declarations of the defendant on the subject were admissible evidence against himself.

III. The question whether Mr. Shotwell was a stockholder in the American Coal Company was properly excluded. It had no relation to any matter in issue in the case. (1 *Phil. Ev.* 169.) Moreover, it was not proper on cross-examination, as it did not grow out of the direct examination; and the court, for this reason, had a right in its discretion (if it were not bound) to exclude the question. (*The Philadelphia and Trenton Rail Road Co.* v. *Stimpson*, 14 *Peters*, 448, 461. *Floyd* v. *Bovard*, 6 *Watts & Serg.* 75.)

IV. The motion to dismiss the complaint was properly denied. There was evidence to go to the jury to prove the facts stated in the complaint, and controverted by the defendants. There was evidence of an over issue (and to an enormous amount) of spurious stock by the defendants; indeed, the allegations of such over issue in the complaint were not controverted. There was evidence to go to the jury to prove that the stock held by the plaintiff was a part of such over issue. The certificates were dated after the full amount of genuine stock had been issued. *Prima facie*, therefore, this was not genuine stock. If it should be objected to this *prima facie* evidence that, as the presumption of law is always against fraud until the contrary is proved, it must be presumed that these certificates were not fraudulent; the answer is, that this legal presumption was rebutted by express proof

Shotwell v. Mali.

that the defendants did make a fraudulent issue of spurious stock, to an enormous amount; so that there can be no presumption of law in this case that this was not spurious stock. Such issue of spurious stock was alleged in the complaint, and not controverted in the answers. It was also clearly proved by express and positive testimony. There was *prima facie* evidence that the stock held by the plaintiff was spurious; there was evidence, therefore, to go to the jury. It was not necessary for the plaintiff to prove that the certificates held by him were not granted upon a transfer of genuine stock. If the defendants, in opposition to the plaintiff's *prima facie* evidence, affirmed that the certificates were issued upon a transfer of genuine stock, the onus of proving it was upon them : (1.) Because on this question they held the affirmative. (2.) Because it was a fact peculiarly within their knowledge and cognizance. (1 *Phil. Ev.* 198, 199. *Clarke* v. *Miller*, 4 *Wend.* 628. 1 *Greenl. Ev.* § 79.) The defendants had peculiar knowledge of the facts, and could tell better than the plaintiff, or any one else, whether these certificates were spurious. And as the law now makes them competent witnesses in their own favor, there are stronger reasons than ever for throwing the *onus probandi* on them in such case. If these certificates were not a part of the over issue, the defendants, who must have known the facts, would have proved it by their own testimony. It is to be presumed from their silence that this stock was spurious. If upon the evidence it was doubtful whether these certificates were or were not a part of such over issues, the question being one of fact upon the evidence, was to be determined by the jury, not by the court. It was proper, therefore, for the court to deny the motion to dismiss the complaint.

V. It was unnecessary to prove that these certificates were purchased directly from the defendants. That fact was not alleged in the complaint; it was sufficient for the plaintiff to prove the facts stated in his complaint. (*Smith* v. *Elder*, 3 *John.* 113. *Safford* v. *Stevens*, 2 *Wend.* 158, 163. *Ed-*

*monds* v. *Walter*, 3 *Starkie*, 7.   *Holt* v. *Miers*, 9 *Car. & P.*
191.   *Blunt* v. *Zuntz*, *Anthon's N. P.* 180.   *Sandford* v.
*Sanford*, 2 *Day*, 559.   *Chapman* v. *Bullington*, 3 *Gale &
Dav.* 33.   *Brewer* v. *Strong*, 10 *Alabama R.* 961.)   At all
events, in this case it was sufficient to prove the facts alleged
in the complaint.   Upon proving the truth of the allegation
contained in any one count or separate statement of a cause
of action, the plaintiff was entitled to a verdict.   Each of the
defendants had demurred to each of these counts or separate
statements, on the ground, among others, that it did not
state facts sufficient to constitute a cause of action.   All these
demurrers had, after very full argument, been overruled by
the court, (first at special term, and afterwards on appeal at
general term,) with leave to them in the usual form to an-
swer.   They availed themselves of this leave, and put in
answers.   They were thereby concluded from disputing after-
wards the point involved in these decisions.   It was *res judi-
cata;* it was the law of *this* case, if it were not of any other.
(*Atkinson* v. *Manks*, 1 *Cowen*, 693, 709.   *Campbell* v. *Stakes*,
2 *Wend.* 137, 144.   *McElwain* v. *Willis*, 9 *id.* 552, 556.
*Brady* v. *Donnelly*, 1 *Comst.* 126.   *Edwards* v. *Blunt*, 1 *Str.*
425.   *Cresswell* v. *Packham*, 6 *Taunt.* 630 ; *S. C.* 2 *Marsh*,
326.   *Mansel on Demurrer*, 162, 10 *Law Lib. N. S.   Gra-
ham's Prac.* 641.)   It is quite immaterial, therefore, what
this court or any other court may have decided in any other
case.   It is settled as the law of this case that it is not neces-
sary for the plaintiff to prove that he purchased the stocks
directly from the defendants.

VI. If, however, it were proper to reconsider the question,
the court would find it their duty to come to the same result.
(*Bagshaw* v. *Seymour*, 93 *Eng. Com. L. R.* 873.   32 *Law
Times R.* 81.)   There is no necessity to prove in such a case
any dealing or privity between the parties.   Even in case of
contract the necessity of such a privity was long ago exploded.
(*Dutton* v. *Poole*, 2 *Lev.* 210 ; 2 *Raym.* 302.   *Schemer-
horn* v. *Vanderheyden*, 1 *John.* 139.   *Forsyth* v. *Ganson*, 5

*Wend.* 558. *Brook* v. *Marbury,* 11 *Wheat.* 78, 97. *Starkie* v. *Mill, Styles,* 296. *Carnegie* v. *Morrison,* 2 *Metc.* 381, 401, 403.) In matters of tort it never existed. It is sufficient to prove that the plaintiff has sustained damage in consequence of the wrongful act of the defendants. A system of jurisprudence which would allow a defendant in such a case to escape all liability, would be manifestly defective in justice and good conscience. Our laws cannot be charged with such a defect. The rule is laid down briefly, but distinctly and fully, by C. B. Comyns, in these words: "In *all* cases where a man has a temporal loss or damage by the wrong of another, he may have an action on the case to be repaired in damages." (*Com. Digest, Action on the Case, A.*) The same rule was laid down by our own great commentator on our law, in a judgment delivered by him in the court of chancery, in similar brief, pointed and explicit terms. " Fraud and damage coupled together will entitle the injured party to relief in *any* court of justice." (*Bacon* v. *Bronson,* 7 *John. Ch. R.* 194, 201.) He had some years previously, in delivering as chief justice the judgment of the supreme court, declared this rule, and added it emphatically to be a *principle of universal jurisprudence.* (*Upton* v. *Vail,* 6 *John.* 183, 184. *Barney* v. *Dewey,* 13 *id.* 226. *Benton* v. *Pratt,* 2 *Wend.* 385.) It would be most unreasonable to make it a condition of the wrongdoer's liability to pay the damages occasioned by his fraud, that he should be reached only in a roundabout way, by a succession of actions between the different individuals through whose unintentional and unconscious agency the damage may have been sustained or developed. This is not according to the spirit and policy of our law. It does not establish any such circumlocution office or proceedings. It discountenances multiplicity of suits. The jurisdiction of chancery in a large class of cases is founded upon this policy, which, in fact, is one of the maxims of the law. (*Francis' Max.* 35. 1 *Story's Eq. Jur.* § 64, *k.*)

VII. In this case, however, there was a privity between

the plaintiff and the defendants.    The certificates of this spu-
rious stock were issued by the defendants to him ; that this
was done through the intervention of agents or brokers, does
not alter the case.    It was legally, as well as morally, a trans-
action between the plaintiff and the defendants.    Neither
would it be altered by the fact, if it had been proven, that
these certificates were used in place of other certificates, for
the defendants are answerable for each successive false certifi-
cate.    Neither would it be altered by the fact that they were
handed in blank to third persons, for in such a case such
third persons are deemed in law authorized by the defendants
to hand them to others, and therefore the defendants are re-
garded as dealing with such others.    (*Allen* v. *Addington*,
7 *Wend.* 9.    *Williams* v. *Wood*, 14 *id.* 126.    *Thomas* v.
*Winchester*, 2 *Selden*, 397.    *Lobdell* v. *Baker*, 1 *Metc.* 193.
3 *id.* 469.    *Kinney* v. *Stone*, 7 *id.* 252.    *Polhill* v. *Walter*,
3 *B. & Adol.* 114.    *Young* v. *Hall*, 4 *Georgia R.* 95.    *Town-
send* v. *Wathen*, 9 *East*, 277.    *Dixon* v. *Bell*, 5 *Mau. & Sel.*
198.    *Scott* v. *Shepherd*, 3 *Wilson*, 894, 898.    *Boswell* v.
*Prior*, 12 *Mod.* 639.)    The certificates held by the plaintiff
were signed by the defendants ; even if considered as a mere
authentication, the defendants thereby became liable to the
plaintiff.    Such certificates or authentications were false and
fraudulent representations of the defendants to the plaintiff.
A person becomes liable, if he is silent when he ought to
speak, even where there is no fraud.    How much more, when
by his actual attestation he fraudulently mislead others.

VIII. The defendants have no just cause of complaint of
the charge made by his honor the judge.    On the contrary,
it was, in various respects, too favorable to them.    The plain-
tiff was not bound to offer back the certificates to the com-
pany.    They were issued in fraud of the company by the
defendants ; the company had no interest in them, and, being
spurious and fraudulent, they could not be of any value to
any one.    It was, moreover, in no sense a case for repudia-
tion.    It was a case of a flagrant fraud.    The plaintiff was

no more required to return the certificates of stock than he would have been to return a letter containing a false representation, on which he had brought an action to recover the damage resulting from such false representations.

IX. The case, as it appears in proof, is one of flagrant and stupendous fraud. False certificates of stock to a vast amount were issued by the defendants, the very persons whose official, special and imperative duty it was to guard against frauds. The plaintiff was an innocent purchaser of some of these certificates. He paid for them on the written representations of the defendants that they were genuine and valid, when, in truth, as they knew, they were spurious and entirely worthless and void. There is reason to believe, upon the evidence, that the defendants by these frauds have acquired immense sums of money. They have made no restitution; no reparation; but they keep these dishonest gains; and now set up no defense but mere technical objections to the form of proceeding.

X. The plaintiff under these circumstances hopes that a judgment will be rendered by the court that will protect the innocent against the guilty, and not the guilty against the innocent, and will vindicate and uphold good morals and the character of our country. The following additional decisions are referred to, on the general question of the liability of persons guilty of frauds similar in kind though not equal in degree to those of the defendants. It will be perceived that courts in England of less extensive jurisdiction than this court have not, in administering the same law as ours, found any difficulty in making such transgressors answerable for their frauds. (*Cross* v. *Sackett*, 2 *Bosw.* 617; *S. C.*, 6 *Abb. Pr. Rep.* 247. 16 *How. Pr. Rep.* 62. *Morse* v. *Switz*, 19 *id.* 275. *Scott* v. *Robinson & Dixon, Queen's Bench in England, January*, 1859. *The Times* (*London*,) 28*th January*, 1859. *Regina* v. *Brown et al. Directors of the Royal British Bank*, 1857. *Harper* v. *Chamberlain*, 11 *Abbott's Pr. Rep.* 234.)

*C. O'Conor* and *J. M. Van Cott*, for the defendants. I. The complaint should have been dismissed. The general term in this district gave judgment for these defendants on the precise ground on which the court directed this verdict for the plaintiff. (*Seizer* v. *Mali*, 32 *Barb.* 76.)

II. If the plaintiff's stock is spurious he has a perfect remedy against his vendor. (*Seizer* v. *Mali, supra. Kendall* v. *Stone*, 1 *Seld.* 14. *Gompertz* v. *Bartlett*, 75 *E. C. L. R.* 849. *Kempson* v. *Saunders*, 4 *Bing.* 5. *Nockles* v. *Crosby*, 1 *Barn. & Cres.* 814.) There is no pretense, here, that such vendor is not pecuniarily responsible as well as liable, or that the remedy against him is in any respect inadequate. To throw away such adequate remedy is a self-inflicted damage, which it is not the business of courts of justice to redress.

III. On the principle of this verdict, the assignee of any invalid non-negotiable chose may, without privity, recover against the maker, or any intermediate party through whose hands it has passed. But no adjudged case sanctions such a principle. (*Thomas* v. *Winchester*, 2 *Seld.* 397. *Seizer* v. *Mali, supra. Mechanics' Bank* v. *The N. Y. & N. H. R. R. Co.*, 3 *Kern,* 599. *Farmers and Mech. Bank* v. *Butchers and Drovers' Bank*, 16 *N. Y. Rep.* 125. *Zabriskie* v. *Smith,* 3 *Kernan*, 322.)

IV. Even if a purchaser in good faith from the defendants could transfer his remedy with the spurious stock, it would be for his vendee to show that his vendor was a *bona fide* purchaser. But, on the principle of the verdict, the plaintiff's vendor might have bought with notice, without prejudice to the plaintiff's remedy.

V. There was no evidence that the stock was spurious, sufficient to be submitted to the jury. There were 30,000 shares of genuine stock in existence, which were subject to daily transfer on the books of the company. There were two modes of making such transfer, viz: 1. Where the transferer had stock standing on the books to his credit, without hold-

ing certificates, the transfer was made from his account to the transferee's stock account, or by the issue of certificates to the transferee. 2. Where the transferer held certificates, by the surrender of such certificates, and the issue of new certificates in their place to the transferee. The evidence is positive that the stock was issued to the plaintiff in one of these two modes, and not by a sale, as of new stock to him at the office of the company. Unless *all* transfers on the company's books, after the over issue commenced, were, in judgment of law, transfers of spurious stock, the jury had *no evidence* on which to found a verdict that the stock in question was *spurious*. A legal presumption so injurious to holders and purchasers of genuine stock ought not to be permitted; especially is this so in the light of a ruling " that there is no sufficient evidence that the genuine and spurious stock cannot be distinguished." It is a corollary of that ruling, that the *onus* was on the plaintiff to show, by evidence, that the stock in question was spurious.

VI. Not only was there no evidence on which to raise a presumption that the stock was spurious, but there was strong affirmative evidence that it was genuine. 1. It was in the *form* of genuine stock, with the usual authentication of genuine official signatures. 2. The plaintiff had, presumptively, the means of proving it to be spurious, if not in fact genuine; and he held the affirmative. 3. The stock was voted upon, as genuine, on the plaintiff's proxy; which was almost conclusive evidence of its genuineness. 4. The defendants offered to prove that, by the plaintiff's vote on the stock, all the corporate property had been transferred to a new company, and that, on the basis of that vote and transfer, he had exchanged the stock in question for a full equivalent of stock in the new company. 5. The evidence received, with that excluded, showed that the plaintiff had claimed the stock to be genuine; that the company had allowed his claim; and that, on such claim and allowance, he had shared in the final dividend of the corporate property at the dissolution. The

conclusion seems inevitable, that the court erred in submitting to the jury the single question of fact on which the verdict rests.

VII. The over issued stock, if not so far authorized as to be valid, was so ratified by the company as to entitle the plaintiff to be indemnified by it. And he obtained that indemnity from the company by taking his dividend in the corporate property transferred to a new company, in which he exchanged his shares, old for new. ·

VIII. Evidence was offered that the plaintiff had realized on the stock in question, by the consent and allowance of the company, property and interests of value probably equal to or exceeding all that he paid for it, and this evidence was excluded. This was clearly erroneous. The plaintiff was entitled to recover only what he lost by the sale of stock to him. After converting it to his own use, making perhaps a large profit on it, he certainly could not recover from the defendants on the basis that their sale of it to him damaged him to the full extent of the sum which he paid for it. This is the basis of his recovery.

*By the Court,* GROVER, J. The only questions presented by the exceptions relate to the cause of action set forth in the third count of the complaint. Only one of the exceptions to the rulings upon the trial in regard to the admissibility of evidence was insisted upon, on the argument. That related to the offer of the defendants to prove that the plaintiff received stock of the American Coal Company for the stock in question, by the consent of the directors of the Parker Vein Coal Company in value exceeding the sum paid by the plaintiff therefor. This exception is not well taken. The plaintiff's right of action was complete upon the purchase. And this right could not be affected by any subsequent action of the directors of the Parker Vein Company, with which the defendants had no connection. The directors had no right whatever to transfer any of the property of the company on

account of fictitious stock ; and if they did so, the stockholders could compel the party receiving the property to account therefor. No grounds for the motion to dismiss the complaint, made by the defendants' counsel at the close of the plaintiff's proof, were stated. It is well settled that an exception to the refusal to grant such a motion cannot be sustained on account of the deficiency of any proof that might have been supplied upon the trial, had the attention of the court and the opposite party been called thereto. It is not claimed by the defendants' counsel that evidence might not have been given that would have sustained the action. The exception is not, therefore, well taken.

The real questions in the case arise upon the exceptions to the charge and the refusals to charge as requested. The defendants' counsel requested the court to charge that there was not sufficient evidence to warrant a finding that the stock was not genuine, and excepted to the refusal so to charge. The evidence showed that the entire capital stock of the company had been issued prior to the dates of the certificates purchased by the plaintiff, and also that the defendants, prior thereto, had, as officers of the company, issued spurious certificates of stock to a considerable amount. This evidence created a presumption that the certificates in question were false and fraudulent. This devolved the burden upon the defendants of showing that the certificates were issued either upon the surrender of certificates of genuine stock, or upon the transfer on the books of the company of such stock—facts peculiarly within the knowledge of the defendants. The like principle should be applied as in the case of a party fraudulently mingling his property with that of another so that it cannot be distinguished, in case the defendants so conducted the business that the spurious could not be distinguished from the genuine, as against them. An exception was taken by the defendants' counsel to the charge of the court that it was not necessary for the plaintiff to prove that the stock was bought of the defendants or of the company. That if the de-

fendants issued this stock and the plaintiff purchased it upon the faith that it was genuine, authenticated as it was, the defendants were liable although the actual purchase was made of others. This exception presents the principal question in the case, and the one mainly relied upon by the defendants' counsel. That is, whether the officers of a corporation, authorized to issue certificates to the stockholders as evidence of title to stock, are liable only to the immediate purchaser of spurious stock falsely and fraudulently certified by them, or liable to any subsequent purchaser buying upon the faith of the false certificate.

This precise question was decided by this court in *Seizer* v. *Mali,* (32 *Barb.* 76.) It was there held that the liability extended only to the immediate vendees of the company or of the defendants. I should follow this case, holding the point as adjudicated, in this court, but for the case of *Cazeaux* v. *Mali* (25 *Barb.* 578) holding the contrary doctrine. These conflicting decisions leave the question open; especially as it does not appear that the attention of the court was called to the latter case, while considering the former. I will briefly state the reasons for my concurrence in the case of *Cazeaux* v. *Mali.* The principle enunciated in the case of *Seizer* v. *Mali* is doubtless sound. The error, if any, is that the case does not come within it. A vendor guilty of fraud in the sale of property is liable only to his vendee, and a subsequent purchaser does not acquire the right of action. The same rule applies in case of a sale with warranty, and a breach. There is not only no privity, but no fraud practiced or contract made with the subsequent purchaser. It is also true that the purchaser of the stock had a remedy against his vendor for a breach of the implied warranty of title. But does such right of action constitute a bar to an action against one who had induced the purchase by a fraudulent representation that the vendor had title to the stock, where damage resulted from the fraud? Clearly not. That is but the common case of frauds committed in transactions between

Shotwell *v.* Mali.

other parties. And it is no answer to the action that the guilty party obtained no advantage from the fraud, or that some remedy, in some form, exists against another party. This action cannot be sustained upon the principle that the plaintiff acquired by his purchase any right of action that any of the prior purchasers of the stock had against the defendants. If sustained at all, it must be upon some other principle. The case shows that the defendants made certificates that certain parties owned specified amounts of stock in the Parker Vein Coal Company, which were false and fraudulent, and caused stock evidenced by such certificates to be sold in the market, and delivered such false certificates to the purchasers. The certificates were affirmations in writing that the parties owned stock as therein expressed. These certificates were presented to the plaintiff, and he purchased upon the faith he reposed therein. It thus appears that the plaintiff purchased upon the written affirmation of the defendants that the party selling had title to the stock; or, in case there was a blank power authorizing a transfer, attached to the certificate, to be completed by filling in the name of any subsequent purchaser desiring a transfer upon the books to him, the effect would be the same. In either case there was the representation of the defendants that the party offering the stock for sale had the right and power to give a title thereto. There is no question but that had the defendants been present upon the purchase by the plaintiff, and then fraudulently represented to the plaintiff that the vendor owned the stock, and the plaintiff was induced thereby to purchase, and he sustained damage from failure of title, the defendants would have been liable to him. It would not be claimed that it would be any defense to the action to show that the defendants had made the same false representations to prior purchasers and were liable therefor. It may be said that the defendants did not authorize the plaintiff's vendors to exhibit the certificate to him, and consequently they are not chargeable with the consequences of such exhibition. Is this

assumption correct? I think that any one furnishing another with a false and fraudulent document purporting to show title in another to any property, is liable to any one sustaining damage from reposing confidence therein. Upon the same principle that a party writing a fraudulent letter, as to the trustworthiness of another, to a particular person, with a view to induce the giving of credit, by such person, is held liable to another giving credit, upon the faith of the letter, to whom the letter may have been shown. In such case there is no privity between the writer of the letter and the party giving the credit, but the writer has been guilty of fraud, and the party giving the credit has sustained damage therefrom, and this is the foundation of the liability. The case in judgment is still stronger. The defendants knew that upon every sale of the stock the certificates would be presented and delivered to the purchaser as evidence of title; and it may be fairly argued that the defendants authorized such presentation and purchases upon the faith thereof. It follows, then, that the defendants having made and issued their certificates, for the purpose of defrauding, are liable to any one sustaining damage by purchasing stock, in consequence of faith in their truth. It is not necessary in this case to discuss the question whether the damages might have been reduced on account of the plaintiff's right of action against his vendor, for breach of warranty, as no such question was raised upon the trial; nor, for the same reason, to determine what effect the recovery in this case would have upon an action brought by a prior purchaser of the same stock, against the defendants, for any injury such purchasers might have sustained. I will simply remark that, as a general rule, every tort-feasor is liable to every person sustaining an injury from the direct consequences of the wrongful act. The only question submitted to the jury was whether the stock was spurious. It will be seen that I place the defendants' liability upon the ground of having issued the certificates in question with the fraudulent design of enabling some one to transfer spurious

stock and thereby to defraud the purchasers. It was necessary that this should be established and found by the jury. The evidence tended to show it, and the defendants' counsel did not request any question to be submitted to the jury, except as to the spuriousness of the stock and whether the purchase of the plaintiff was made of the defendants or the company, or whether made of some one else. The former question was submitted and the jury found for the plaintiff. The latter was not material. A new trial should be denied, and judgment rendered for the plaintiff, upon the verdict.

New trial denied.

[NEW YORK GENERAL TERM, November 24, 1862. *Ingraham, Clerke* and *Grover*, Justices.]